IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.                                                    Criminal No. ELH-16-0499

MILES GUEST,
*Defendant*.

**MEMORANDUM OPINION**

The self-represented defendant, Miles Guest, has filed a motion for compassionate release

under 18 U.S.C. § 3582(c)(1)(A).  ECF 102.[1]  He subsequently filed several supplements to his

motion.  ECF 106; ECF 107; ECF 115.  I shall construe ECF 102, ECF 106, ECF 107, and ECF

115 collectively as the "Motion."  The government opposes the Motion.  ECF 109.  Defendant has

replied.  ECF 111.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the

Motion, without prejudice.

### I.      Factual and Procedural Summary[2]

Defendant and a codefendant were indicted on October 13, 2016.  ECF 12.  They were

charged with Hobbs Act Robbery of a GameStop video game store in Catonsville, Maryland on

---

[1] By notice of July 7, 2021, the Federal Public Defender has declined to represent Mr. Guest.  ECF 104.

[2] The case was initially assigned to Judge J. Frederick Motz.  It was reassigned to me in October 2017, due to the retirement of Judge Motz.

January 13, 2016, in violation of 18 U.S.C. § 1951(a) (Count One), and brandishing a firearm in relation to a crime of violence (*i.e.*, Count One), in violation of 18 U.S.C. § 924(c) (Count Two).[3]

On September 11, 2017, the defendant entered a plea of guilty (ECF 42) to Count One, Hobbs Act Robbery, pursuant to a Plea Agreement. ECF 43. The plea was entered under Fed. R. Crim. P. 11(c)(1)(C), calling for a sentence ranging from 120 to 144 months of incarceration. *Id.* ¶ 9.

In the Plea Agreement, the defendant stipulated to the commission of six armed robberies. *Id.* ¶ 6(b). In particular, defendant agreed to the following offenses, ECF 43 at 9-10, *id.*:

December 1, 2015 (7-Eleven, Catonsville)

On December 1, 2015, at approximately 1:20 a.m., the defendant and another person entered the 7-Eleven store located at 1611 Edmondson Avenue, Catonsville, Maryland. They brandished a firearm, and ordered the store clerk to lie on the floor. The two stole numerous packs of Newport cigarettes and money from the store's cash register. They then fled from the location.

December 29, 2015 (GameStop, Pikesville)

On December 29, 2015, the defendant and another person entered the GameStop store located at 3755 Old Court Road, Baltimore, Maryland. The suspects pointed a firearm at employees and customers and forced them into the rear of the store. They demanded that all store occupants deliver up their cellular phones. The defendant and his accomplice then removed XBox One gaming systems from the shelves and left the store.

January 4, 2016 (GameStop, Glen Burnie)

On January 4, 2016, at approximately 7:31 p.m., the defendant and another person entered the GameStop store located at 7300 Ritchie Highway, Glen Burnie, Maryland. They pointed a firearm at employees and customers and demanded money from the store employees. The defendant and the other suspect took personal items from several store employees and then forced them into a room in the rear of

---

[3] In reciting the facts, the government erroneously states that defendant was charged on September 7, 2017, in a Superseding Indictment (ECF 39), with multiple Hobbs Act robberies and related offenses committed during a crime spree from December 1, 2015 to January 13, 2016. ECF 109 at 2. The Superseding Indictment contains 23 counts, but it names only the codefendant, not Guest. However, as discussed, *infra*, defendant committed several armed robberies.

the store. Prior to exiting the store, the defendant and the other suspect stole cash from the register and approximately seven (7) XBox One gaming systems.

January 4, 2016 (GameStop, Windsor Mill)

On January 4, 2016, at approximately 8:52 p.m., the defendant and another person entered the GameStop store located at 8067 Windsor Mill, Maryland. They pointed a firearm at, and demanded money from, the store employees. One of the suspects grabbed two customers and took them to a back room. The second suspect asked the associates to open the cash registers and collected the money contained therein. After collecting the money, the defendant and the other suspect forced two store employees to the backroom. There, the two suspects stole cellphones from the employees and the customers. In addition to the money taken from the register, approximately four XBox items were stolen.

January 11, 2016 (7-Eleven, Catonsville)

On January 11, 2016, the defendant and another person entered the 7-Eleven store located at 1611 Edmondson Avenue, Catonsville, Maryland. They pointed a firearm at, and demanded money, from the store employees. The pair stole money from the register and numerous packs of Newport cigarettes. They then exited the store.

January 13, 2016 (GameStop, Catonsville)

On January 13, 2016, the defendant, Miles Guest, and another man entered the GameStop store at 5768 Baltimore National Pike, Catonsville, Maryland. The GameStop store is a commercial business that buys and sells merchandise in interstate commerce.

At the time he entered the store, Miles Guest was wearing black sweatpants and a black hoodie. The second suspect was wearing a yellow construction vest and purple construction hat bearing the logo "DCS Staffing." The suspects pointed a revolver at a store employee and demanded all of the money in the register, while the second suspect demanded video games. The suspects thereafter instructed the employee and a male customer to go to the back of the store, at which point they robbed the store of seven PS4 gaming systems. The suspects then departed, and the employee dialed 9-1-1.

A police officer responded to the 9-1-1 call [and] noticed a vehicle speeding away from the parking lot and gave chase. The suspect vehicle—in which Miles Guest and the second suspect were driving—suddenly and recklessly evaded the officer, sped away, ran a stop sign, and nearly collided with several motorists and pedestrians during flight. Eventually, the defendants' vehicle crashed into a Baltimore County Police station. The defendant and the second suspect then exited the vehicle and fled on foot.

Thereafter, police apprehended Miles Guest. Police sought, obtained, and executed a search warrant of the vehicle. Investigators recovered video game consoles and materials matching the items stolen from the GameStop. Police recovered a revolver resembling that used in every previous robbery as well as an additional handgun.

In all of the aforementioned robberies, the defendant took U.S. currency and/or personal property from, or in the presence of, employees and customers by the use of force or fear of injury. In each robbery, the taking of money and property by the defendant affected, obstructed, interfered with and otherwise delayed commerce because it deprived the stores of proceeds that would have used to purchase and transact in interstate commercial goods, including goods manufactured outside Maryland, for sale within Maryland. The stores all comprise multi-state corporations that coordinate commercial activities interstate and the robbery of U.S. currency and property from the store would also affect interstate commerce by diminishing profits or requiring purchase of interstate commodities to replace the loss.

The Presentence Report ("PSR", ECF 60) reflected that defendant had a final offense level of 28. *Id.* ¶ 65. And, defendant had a criminal history category of III. *Id.* ¶ 75. The defendant's prior criminal history included possession of non-marijuana drugs, driving without a license, and driving while impaired by a controlled dangerous substance. *Id.* ¶¶ 68-73. His sentencing guidelines called for a sentence ranging from 97 to 121 months of imprisonment. *Id.* ¶ 101.

Of import here, the PSR also indicated that defendant holds a high school diploma. *Id.* at 3. Moreover, it indicates that defendant has an extensive family, including seven siblings. *Id.* ¶ 85. Guest also has a girlfriend, Shaniqa Harper, with whom he shares a young daughter. *Id.* ¶ 87.[4]

Moreover, the PSR reflected that Guest has long struggled with substance abuse. *Id.* ¶ 93. In particular, it noted that, at the age of 15, Guest began taking on a daily basis prescription drugs and smoking marijuana. *Id.* He has not yet participated in any substance abuse programming, but requested that he be given the opportunity to obtain such treatment while incarcerated. *Id.*

---

[4] The PSR refers to Ms. Harper as "Shanika Harper." ECF 60, ¶ 87. But, defendant's filings indicate that Ms. Harper's first name is spelled "Shaniqa." *See* ECF 102 at 4.

Sentencing was held on December 8, 2017.  ECF 69.  At the time, defendant was twenty-seven years old.  ECF 60 at 3.  The Court sentenced Guest to 130 months' incarceration, with credit for time served since January 13, 2016.  ECF 70 at 2.  Defendant was also sentenced to a three-year term of supervised release.  *Id.* at 3.  In rendering the sentence, the Court was mindful that the government had agreed to forego pursuit of the § 924(c) charge.  *See* ECF 71.

The defendant is currently incarcerated at FCI Petersburg Medium and has a projected release date of August 7, 2025.  *See Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed June 3, 2022).  To date, he has served approximately 58% of his sentence

On June 2, 2021, the defendant filed the Motion, including documentation that he has exhausted his remedies.  *See* ECF 102-2 at 6-8.  Guest argues that he should be released because, *inter alia*, he is the sole available caregiver for his young daughter, who was nine when the Motion was filed.  ECF 102 at 4.  Specifically, he notes that his girlfriend, Shaniqa Harper, is currently the "primary caregiver" for their daughter, *id.* at 15; she is an "essential worker," *id.* at 14; and she is without child care due to the deaths of defendant's father and grandmother as a result of COVID-19.  *Id.*; *see id.* at 4 (identifying Ms. Harper's job); *see also* ECF 107-1 (scanned photograph of Ms. Harper's employee badge); ECF 106-1 (obituaries of Guest's father and grandmother).  Guest also maintains that he should be released in light of the danger posed to him by COVID-19.  ECF 102 at 19-21.

The government contends that Petitioner does not meet the "extraordinary and compelling" criteria for compassionate release based on his family circumstances and the risk of exposure to COVID-19.  ECF 109 at 5.  It observes that "the BOP has implemented safety measures that have greatly reduced the spread of COVID-19 within its facilities . . . ."  *Id.*  Moreover, the government contends that Petitioner is not eligible for compassionate release "because he has not identified

any condition that he currently has that is on the CDC's list of risk factors, or indeed any chronic medical ailment." ECF 109 at 21.  Alternatively, it urges the Court, in its discretion, to deny the Motion because of the serious crimes at issue, and because defendant has not served sufficient time in prison.  *Id.* at 23-26.

## II.    Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C.       § 3582(c)(1)(B);       *see*       *Jackson*,       952       F.3d       at       495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute

discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses

7

for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and

compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[5]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States*

---

[5] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t). However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187. Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to

10

compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  But, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion; *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant.  *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169.  Nevertheless, compassionate release is a "rare" remedy.  *White v.*

11

*United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94;

*United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16,

2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every

§ 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers

a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*,

___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses

its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized

factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises,"

or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III.    COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11,

2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6]  COVID-19 spawned

"a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA*

*v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*,

2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths,

according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S.*

*COVID    deaths    after    losing    political    battles*, Reuters    (May    12,    2022),

---

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/.

And, as of June 9, 2022, COVID-19 has infected more than 85.2 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Jun. 9, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In May 2022, it updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe illness

from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Particularly at the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

15

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954

F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[7]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney

---

[7] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.).  On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[8]  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 67% of the total U.S. population is fully vaccinated, including 29% of people from ages 5 to 11, 60% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 91% of

___

[8] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

people age 65 and up. *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Jun. 9, 2022).

Moreover, approximately 104.1 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Apr. 15, 2022). And, federal regulators recently approved a second booster dose for individuals age 50 and older. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of June 9, 2022, the BOP had 139,779 federal inmates and approximately 36,000 staff. And, by that date,

the BOP had administered 320,257 vaccine doses to staff and inmates.  *See COVID-19*, FEDERAL

BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed Jun. 9, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.

*See* For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See*

David   Leonhardt,   *Covid   Cases   Keep   Falling*,   N.Y.   TIMES,   Oct.   27,   2021,

https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html   ("The   number   of

new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the

magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the

trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.  *See*

*also Eden LLC v. Justice*, ___ F.4th ___, 2022 WL 1790282, at \*4 (4th Cir. June 2, 2022) (noting

the sequential "deadly surges in COVID-19 cases caused by the Delta and Omicron variants").

The Delta variant was thought to be more virulent than were earlier strains of COVID-19.

*See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND

PREVENTION,   https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html   (updated

Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous

variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*,

WALL   ST.   J.,   Nov.   1,   2021,   https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-

leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious

toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily

averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What*

*to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021),

https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August

14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States.  It sparked further cause for concern, because it was highly contagious.  *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022),                https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   And, the country began to return to normalcy.

Nevertheless, we are once again experiencing a surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.  Indeed, a new subvariant of the virus is "spreading rapidly and will probably become the dominant form of the virus in the United States in the next few weeks."   *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this fall and winter . . . ."  Amelia Nirenberg, *A Coming Fall Surge?*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

As of June 9, 2022, the BOP reported that 165 federal inmates, out of a total population of 139,779, and 300 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 50,906 inmates and 12,810 staff have recovered from the COVID-19 virus. In addition, 295 inmates and seven staff members have died from the virus.  The BOP has completed 128,717 COVID-19 tests.  *See COVID-19*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed Jun. 9, 2022).

With respect to FCI Petersburg Medium, where the defendant is imprisoned, the BOP reported that as of June 9, 2022, out of a total of 1,597 inmates, zero inmates or staff have tested positive, one inmate has died of COVID-19, and 249 inmates and 44 staff have recovered at the facility. In addition, across Petersburg Low FCI and Petersburg Medium FCI, 475 staff members and 2,450 inmates have been inoculated with the vaccine.  *See id.*; *see also* Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/bmp/ (last visited Jun. 9, 2022).

## IV.    Discussion

In the Motion, Guest asserts that he has demonstrated extraordinary and compelling circumstances that warrant his release, primarily on two grounds: he is the sole available caregiver for his minor daughter and, in light of the ongoing COVID-19 pandemic, his continued incarceration poses a risk to his well-being. ECF 102 at 15-21.  He also asserts that the sentencing factors set forth in 18 U.S.C. § 3553(a) militate in favor of his release.  *Id.* at 21-25.

The government responds that Guest has failed to present an extraordinary and compelling circumstance that warrants his release.  As to defendant's family circumstances, the government points out, among other things, that Ms. Harper, defendant's girlfriend, is an available caregiver for their daughter.  ECF 109 at 17-18.   Further, the government claims that defendant has failed to show that he suffers from any medical condition that might render him particularly vulnerable

to COVID-19.  *Id.* at 21-22.  And, in any event, defendant has been vaccinated against COVID-19.  *Id.* at 22.  Moreover, the government contends that the sentencing factors set forth in 18 U.S.C. § 3553(a) compel the denial of the Motion.  *Id.* at 23-26.

## A.  Exhaustion

As mentioned, a court may only consider a defendant's motion for compassionate release if the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(1)(A).

Defendant submitted records to the Court reflecting that on March 12, 2021, he filed a petition for compassionate release with the Warden.  ECF 102-2 at 6-8.  The record does not reveal whether the Warden ever responded to the request.  I am satisfied that defendant has exhausted his administrative remedies.

## B.  Extraordinary and Compelling Circumstance

### 1.  Family Circumstances

As noted, defendant claims that his family circumstances warrant his release from prison. He asserts: "Shaniqa Harper, Mr. Guest's girlfriend, is an essential worker who is the primary caregiver for their nine year old daughter."   ECF 102 at 15.  Guest maintains that, "[w]ithout available day care given the COVID pandemic, Ms. Harper relied on Mr. Guest's father and grandmother to care for their daughter given her full-time essential worker employment."  *Id.* at 15-16.  However, according to Guest, his father and grandmother both died due to complications from COVID-19. *Id.* at 5-6; *see* ECF 106-1.  Therefore, Guest concludes that he should be released so that he may look after his daughter while Ms. Harper is at work.  ECF 102 at 16-17.

As discussed earlier, the Fourth Circuit has instructed: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *Taylor*, 820 F. App'x at 230 (citing 18 U.S.C. § 3582(c)(1)(A)).   And, relevant here, the commentary to U.S.S.G. § 1B1.13 provides that "[t]he incapacitation of the caregiver of the defendant's minor child or minor children"  may constitute a compelling reason for the defendant's release.  U.S.S.G. § 1B1.13 cmt.1(C)(i).

But, in the absence of evidence that an inmate is the sole available caregiver for his child, district courts typically find that the inmate's family circumstances do not amount to an extraordinary and compelling reason within the meaning of 18 U.S.C. § 3582(c)(1)(A).  *See, e.g.*, *United States v. Rivera*, CR 15-2990 RB, 2021 WL 6062828, at *2-3 (D.N.M. Dec. 22, 2021); *United States v. Best*, 5:19-CR-293-D-2, 2021 WL 5985568, at *4 (E.D.N.C. Dec. 16, 2021); *United States v. Jimmerson*, Crim. No. 17-13-JWD-RLB, 2021 WL 4342330, at *3 (M.D. La. Sept. 23, 2021); *United States v. Thomas*, 3:17-CR-0154-B-9, 2020 WL 6737872, at *2-3 (N.D. Tex. Nov. 16, 2020).

BOP     Program     Statement     §     5050.50     is     also     relevant. *See*  https://www.bop.gov/policy/progstat/5050_050_EN.pdf; *see also United States v. Roberts*, CCB-13-0407, 2021 WL 5744687, at *1 (D. Md. Dec. 1, 2021)  (explaining that courts "possess independent discretion—guided, but not bound by, Sentencing Commission and BOP criteria—to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence") (citing *McCoy*, 981 F.3d at 288).  Of import here, in subsection five, BOP Program Statement § 5050.50 indicates that an inmate may request compassionate release based on "the death or incapacitation of the family member caregiver of an inmate's child . . . ."

Notably, "incapacitation" is a high bar. The defendant must show either that the "caregiver suffered a severe injury (e.g., auto accident) or suffers from a severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child." BOP Program Statement § 5050.50(5). Moreover, this provision states that the inmate must show that "the deceased/incapacitated family member was and still is the only family member caregiver capable of caring for the inmate's minor child." *Id.*

Accordingly, I am persuaded that defendant's family circumstances do not qualify as an extraordinary and compelling reason for his release. The deaths of defendant's father and grandmother are undeniably tragic. Moreover, the Court is sympathetic to Ms. Harper's plight and the difficulties she has experienced in trying to secure childcare. Nonetheless, the fact that Ms. Harper is employed full-time does not render her incapacitated within the meaning of BOP Program Statement § 5050.50(5). In other words, because Ms. Harper remains an available caregiver to defendant's daughter, Guest's family circumstances do not amount to extraordinary and compelling circumstances. Her circumstances, although challenging, are hardly uncommon. The child does attend school. In any event, the struggle to find suitable childcare is one faced by people in every walk of life.

To be sure, BOP policy is not binding on the resolution of the Motion. But, I am guided by its provisions. And, district courts throughout the country have denied motions for compassionate release in substantially similar circumstances. *See*, *e.g.*, *United States v. Washington*, 2:18-CR-46-RMP-1, 2022 WL 1182696, at *3-4 (E.D. Wash. Apr. 20, 2022) (denying motion for compassionate release where defendant's mother, who had been the "main source of childcare assistance" died, in light of the fact that the mother of the defendant's children was not incapacitated); *United States v. Broome*, 3:19-cr-384-MOC, 2022 WL 893110, at *4

25

(W.D.N.C. Mar. 25, 2022) (explaining that although the medical condition of defendant's wife has "made it difficult to care for their children during the COVID-19 pandemic, [defendant] does not assert that she has become incapacitated such that she is unable to care for the children"); *United States v. Dogan*, 2:16-cr-00198-JAM-1, 2020 WL 4208532, at *3 (E.D. Cal. Jul. 22, 2020) ("The Court recognizes that caring for children fulltime, in the midst of a public health crisis, is increasingly challenging.  But it is neither unusual nor insurmountable.").

For instance, in *United States v. Farlow*, Crim. No. 18-044 (SRC), 2021 WL 1207485 (D.N.J. Mar. 30, 2021), a district court considered circumstances substantially similar to those present in this case.  The defendant in that case requested compassionate release on the ground that "the mother of his children is an essential worker, and thus . . . she is having great difficulty caring for their minor children during the covid-19 [sic] pandemic while [defendant] is incarcerated."  *Id.* at *3.  The district court denied the request, explaining, *id.*:

> [Defendant] has not alleged that the mother of his children has passed away or is incapacitated; rather, he has merely claimed that her position as an essential worker makes it difficult for her to care for their children without his assistance.  While the Court understands the hardship that this may present for [defendant's] family, this is not the same as a caregiver being incapacitated, and thus is not a basis for compassionate release under the statute.

At bottom, Ms. Harper's full-time employment does not render her incapacitated.  To the contrary, she remains an available caregiver for her daughter.  Accordingly, defendant's family situation does not qualify as an extraordinary and compelling circumstance that warrants his release from prison.

## 2.  COVID-19

Defendant, who is now thirty-one years old, argues that he qualifies for compassionate release because of the danger his continued incarceration poses to him, in light of the ongoing COVID-19 pandemic.  ECF 102 at 19.  Guest states that he is "an African-American male," which

"plac[es] him at a higher risk of catching COVID[.]"  *Id.*  And, in a subsequent filing, Guest indicates, albeit without any corroborating documentation, that he has a history of smoking and as well as substance abuse.  ECF 115 at 3; *see also* ECF 60, ⁋ 93 (noting that defendant has struggled with substance abuse since the age of 15).

Defendant points out (ECF 102 at 19) that, according to data analyzed by the CDC, "Black, Non-Hispanic persons" are disproportionately more likely to contract, be hospitalized by, and die from COVID-19 than "White, Non-Hispanic persons."  *Risk for COVID-19 Infection, Hospitalization, and Death By Race/Ethnicity*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last updated Jun. 2, 2022).

However, the CDC also indicates: "Race and ethnicity are risk markers for other underlying conditions that affect health, including socioeconomic status, access to health care, and exposure to the virus related to occupation, e.g., frontline, essential, and critical infrastructure workers."  *Id.* Further, it cautions that this data should be "[a]djust[ed] by age . . . because risk of infection, hospitalization, and death is different by age, and age distribution differs by racial and ethnic group."  *Id.*  Thus, "[i]f the effect of age is not accounted for, racial and ethnic disparities can be underestimated or overestimated."  *Id.*

In other words, although "[s]tatistically speaking, . . . African Americans (and other minority communities) are overrepresented among patients hospitalized for [COVID-19]," the CDC has not found that "this is a result of inherently increased susceptibility to coronavirus." *United States v. Wade*, 5:15-cr-00458-EJD-1, 2020 WL 3254422, at *3 (N.D. Cal. Jun. 16, 2020). Rather, "[t]he CDC . . . attributes the higher rates of hospitalization amongst African Americans

to longstanding systemic health and social inequities." *United States v. Jones*, 482 F. Supp. 3d 969, 982 (N.D. Cal. 2020) (citation and internal quotation marks omitted).

Accordingly, courts have said that "a defendant's status as 'a minority male does not [itself] constitute a risk factor for COVID-19 in the same that an underlying medical condition does.'" *United States v. Harris*, 505 F. Supp. 3d 1152, 1162 (D. Kan. 2020) (quoting *United States v. Lamas*, No.12-20119-02-JWL, 2020 WL 5593839, at *2 (D. Kan. Sept. 18, 2020) (alteration added)). *See also United States v. Scott*, No. CR13-156 TSZ, 2020 WL 7043593, at *1 (W.D. Wash. Dec. 1, 2020) (finding that "race is not itself a risk factor" for COVID-19); *United States v. Wilson*, CCB-14-334, 2020 WL 4286873, at *2 (D. Md. Jul. 27, 2020) (dismissing argument that defendant's race amounted to an extraordinary and compelling circumstance in light of the COVID-19 pandemic because defendant failed to provide "evidence that [defendant] himself [was] particularly vulnerable to COVID-19") (emphasis omitted); *United States v. Leigh-James*, 3:15-cr-188 (SRU), 2020 WL 4003566, at *8 (D. Conn. Jul. 15, 2020) (rejecting defendant's argument that "he is at a higher risk of serious illness because of his race").

Defendant also asserts that he has a history of smoking and substance abuse. ECF 115 at 2-3. And, these conditions are among those that, according to the CDC, "can make you more likely to get very sick from COVID-19." *Certain Medical Conditions, supra*. In addition, the CDC cautions that "[a] person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases." *Id.*

But, Guest has not provided any further information regarding his history of smoking or the current state of his substance abuse . Moreover, court rulings as to whether being an ex-smoker constitutes extraordinary and compelling circumstances are mixed, at best. *See, e.g.*, *United States v. Avalos*, 856 Fed. App'x 199, 205 (10th Cir. 2021) (reversing district court's denial of

28

compassionate release "solely on the basis" of its erroneous finding that being a former smoker was not identified by the CDC as increasing the risk of complications from COVID-19, but expressing no opinion on the ultimate merits); *United States v. Murry*, 538 F. Supp. 3d 615, 618 (E.D. Va. 2021) (declining to find extraordinary and compelling circumstances for defendant, who had not regularly smoked cigarettes in ten years); *United States v. Brady*, CR No. 19-054-JJM, 2020 WL 7323366, at *3 (D.R.I. Dec. 11, 2020) (noting that "smoking history alone is not sufficient for this Court to find extraordinary and compelling grounds for release"); *Musa v. United States*, 502 F. Supp. 3d 803, 814 (S.D.N.Y. 2020) ("[C]ourts in this circuit have concluded that the mere assertion that a defendant is a former smoker is insufficient to merit release."); *United States v. Greene*, No. 1:17-CR-00012-NT, 2020 WL 4475892, at *4 (D. Me. Aug. 4, 2020) (40 year old former cigarette smoker with no other medical conditions that elevate risk of contracting COVID-19 did not establish extraordinary and compelling grounds for release); *United States v. Tranter*, 471 F. Supp. 3d 861, 865 (N.D. Ind. 2020) (defendant's status as a former smoker "could put him at an increased risk for severe illness," but he "has identified no adverse health effects resulting from his smoking past").

Likewise, many courts have appeared skeptical that a defendant's substance abuse can, on its own, qualify a defendant for compassionate release. *See United States v. Reece*, 2:13-CR-00046-JRG-4, 2022 WL 1196987, at *2 (E.D. Tenn. Apr. 21, 2022) (finding that because defendant's substance abuse is "not uncommon," it did not render him eligible for compassionate release); *United States v. Jackson*, 3:16-cr6-01, 2022 WL 1178513, at *2 (E.D. Va. Apr. 20, 2022) (noting that defendant's assertion of a substance abuse was not sufficiently serious to grant him compassionate release because it is a "chronic condition[ ] that can be managed in prison [and thus is] not a sufficient basis for compassionate release") (internal quotation marks omitted; some

alterations added); *United States v. Richer*, 3:18-cr-00311-MOC, 2021 WL 1553827, at *4-5 (W.D.N.C. Apr. 20, 2021) ("Defendant does not assert that . . . a substance use disorder places him at any increased risk relating to COVID-19, especially since he is incarcerated and unable to engage in substance use or abuse"); *United States v. Lara*, 3:16-CR-30160-RAL, 2021 WL 1207875, at * (D.S.D. Mar. 30, 2021) ("This Court believes many incarcerated persons likely have substance use disorders, so that condition alone, in the context of compassionate release, is not extraordinary and compelling.") (internal quotation marks omitted).

Moreover, BOP records reflect that defendant has received at least one dose of an authorized COVID-19 vaccine. ECF 109 at 22; *see* ECF 109-1 at 1.[9]  Further, the parties appear to agree that defendant has become fully vaccinated against COVID-19. ECF 109 at 22; ECF 115 at 3. Accordingly, the Court shall assume that defendant has become fully vaccinated during the pendency of the Motion.[10]

That said, vaccination does not preclude compassionate release. As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

As illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable. In particular, the Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can

---

[9] On March 2, 2021, defendant initially refused to receive an authorized COVID-19 vaccine. ECF 109-1 at 1, 2. But, approximately two months later, on May 4, 2021, defendant was provided the first dose of the Moderna vaccine. *Id.* at 1.

[10] District courts have uniformly found that a prisoner's refusal to become fully vaccinated significantly undermines the claim of susceptibility to the effects of COVID-19 as a ground for compassionate release. *See, e.g., United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases).

result in death.  *See Rates of COVID-19 Cases and Death by Vaccination Status*, CNTRS. FOR DISEASE CONTROL, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed May 11, 2022).  Indeed, a recent analysis of "nationwide data" from the CDC revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave."  Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, WASH. POST (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

To that end, the CDC issued recommendations encouraging everyone ages 12 years and older to receive one COVID-19 booster shot after completing their primary COVID-19 vaccination series.  *See COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL, https://bit.ly/3MdQMM6 (last updated May 24, 2022).  Moreover, all adults ages 50 years and older are eligible for a second booster shot.  *See id.*  Nonetheless, the parties have not presented the Court with any evidence regarding whether defendant has received a booster.

In sum, a defendant's vaccination status "does not negate that his underlying health conditions make him eligible for compassionate release."  *Spriggs*, 2021 WL 1856667, at *3.  Nonetheless, defendant must still establish a qualifying medical condition to demonstrate that he is particularly susceptible to COVID-19 and thus eligible for compassionate release.

Additionally, as mentioned above, no inmates or BOP staff members at FCI Petersburg Medium, the facility wherein defendant is currently incarcerated, currently test positive for COVID-19.  *See COVID-19*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed Jun. 9, 2022).  As Judge Chuang of this Court observed: "While the Court does not consider the actual presence of COVID-19 within a prison to be a necessary prerequisite for a

finding that an inmate with a high-risk medical condition should be released . . ., the fact that there are no cases at [the relevant facility] reduces the imminence of the risk to [defendant] and must be considered." *United States v. Wright*, TDC-17-0388, 2020 WL 2571198, at *3 (D. Md. May 21, 2020)

Accordingly, I am persuaded that defendant has failed to establish extraordinary and compelling circumstances for his release.

## C. Sentencing Factors

Even if defendant had established extraordinary and compelling circumstances, I would not grant the Motion. This is because when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186. These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *Id.*

Defendant's conduct in this case was quite serious. He participated in the commission of six armed robberies that occurred over the course of one month. ECF 43 at 4, 10-11. And, to date, Guest has served only 58% of his 130-month sentence. ECF 70 at 2; ECF 71 Although that sentence was above the range contemplated by the Guidelines (*see* ECF 60, ⁋ 101), it was within the range provided by the parties' Plea Agreement. ECF 43, ⁋ 10. Moreover, the Guidelines range was reduced because the government agreed to forego pursuit of the offense under 18 U.S.C. §

924(c).  ECF 70 at 1; *see* ECF 12 (Indictment) at 3.  Thus, I am of the view that Guest's time served to date does not adequately reflect the seriousness of his criminal activity.

Guest's criminal history is relatively minor.  *See* ECF 60, ¶¶ 68-73.  Moreover, Guest asserts that he "has a viable release plan in place to protect the public interest."  ECF 102 at 24.  Specifically, he states that he "will live with his girlfriend and daughter at their residence . . . in Baltimore."  *Id.* at 25.  And, he claims, without supporting documentation, that he has obtained a job offer at an entity called "Middleton and Mead."  *Id.*; *see also* ECF 111 at 3 (stating that "the owner of Middleton and Mead . . . told [defendant] that he could always find a job there").

In *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Supreme Court recognized that a defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's] 'history and characteristics.'" (Quoting 18 U.S.C. § 3553(a)(1)).  Relevant here, defendant states that he "has completed multiple post-sentencing rehabilitation programs while he has been incarcerated."  ECF 102 at 22; *see* ECF 102-1 at 2-4 (reflecting that Guest has completed various fitness classes and has a work assignment).  But, the Fourth Circuit has instructed that "rehabilitation alone cannot serve as a basis for compassionate release."  *Davis*, 2022 LW 127900, at *1.

In any event, defendant's claim regarding his rehabilitation is undermined based on a review of his disciplinary history.  Indeed, according to records submitted by the government, defendant has incurred three disciplinary infractions during his term of imprisonment.  ECF 109-3.  Of greatest concern to the Court, on September 29, 2020, defendant was sanctioned for the use of drugs and alcohol.  *Id.*  And, on December 19, 2019, Guest was sanctioned for possession of a hazardous tool.  *Id.*

33

As I see it, the severity of the instant offense, the length of time the defendant has served to date, coupled with defendant's disciplinary record, militate against defendant's release at this time.  Thus, I shall deny the Motion, without prejudice.

## V.      Conclusion

In light of the foregoing, I shall deny the Motion, without prejudice.   An Order follows, consistent with this Memorandum Opinion.

Date: June 9, 2022                                               _____/s/_____

                                                                Ellen L.  Hollander
                                                                United States District Judge

34